2022 IL App (2d) 210134-U
No. 2-21-0134
Order filed  August 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Winnebago County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 18-CF-3003 |
| | ) | |
| DEVONTAE TYRESE WRANCHER, | ) | Honorable |
| | ) | Ronald J. White, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Bridges and Justice Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The evidence was sufficient to sustain defendant's conviction for first-degree murder under an accountability theory.  (2) Any error in denying defendant's motion to sever his trial from his codefendant's trial was harmless.  (3) The court did not err in sentencing defendant to 50 aggregate years' imprisonment.  Affirmed.

¶ 2    After a joint jury trial with his codefendant, Sanchez Akeem Curry, defendant, Devontae

Tyrese Wrancher, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2018)).[1] The

---

[1]Curry was convicted of first-degree murder and was sentenced to life in prison.  On May

trial court sentenced defendant to 50 years' imprisonment. He appeals, arguing that (1) the evidence was insufficient to sustain his conviction; (2) the trial court abused its discretion in denying his motion for severance; and (3) his sentence was excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant and Curry were charged with first-degree murder and other offenses, including mob action, in connection with the death of Anton Harris. The State's theory of the case was that, at 8 p.m. on September 23, 2018, defendant and Curry lured Harris to an apartment complex in Rockford to kill him. While defendant spoke with Harris in the complex's parking lot, Curry twice shot Harris, killing him. Defendant, who admitted he was present when Harris was shot, maintained that he did not know the shooter's identity or that a shooting was going to occur.

¶ 5                              A. Pretrial Motion to Sever

¶ 6      Prior to trial, defendant moved to sever his trial from that of Curry. 725 ILCS 5/114-8 (West 2018). He argued that his defense conflicted with and was antagonistic toward Curry's defense. As relevant here, defendant noted that the State had provided discovery that reflected that a witness believed defendant and Curry were both culpable because defendant was not harmed during the shooting. The trial court denied the motion and noted that its ruling was interlocutory in nature and the issue could be revisited at any time.

¶ 7      The case proceeded to trial, with defendant represented by counsel and Curry proceeding *pro se*.

¶ 8                              B. State's Case-in-Chief

---

11, 2022, this court affirmed Curry's conviction and sentence. *People v. Curry*, 2022 IL App (2d) 210260-U.

¶ 9                                                  1. Deputy Andrew McCulloch

¶ 10    Winnebago County Sheriff's Deputy Andrew McCulloch testified that, on September 23, 2018, at 7:57 p.m., he responded to a 911 call at the Great Oaks apartment complex on Linden Avenue in Rockford.  At the scene, he was flagged down by a woman in a red car who was later identified as Deneshia Epps.  Epps told McCulloch that her boyfriend had been shot.  McCulloch followed Epps to a parking space, where he saw Harris lying face down and bleeding from his back.  McCulloch subsequently observed what appeared to be a gunshot wound to Harris's back.  Harris was breathing but was not responsive.  Paramedics transported him to the hospital, and McCulloch later went to the hospital and learned that Harris had died.

¶ 11                                                  2. Deneshia Epps

¶ 12    Deneshia Epps testified that Harris was her boyfriend on September 23, 2018, when she drove her infant son from her Freeport home to pick up Harris in Chicago.  As the three returned to Freeport, Harris was talking to someone on the Snapchat program on his phone.  They stopped at the Great Oaks apartment complex in Rockford, because Harris wanted to meet someone and pickup a bank card from him.  The person speaking to Harris on Snapchat provided him an address where they were to meet but neither Epps nor Harris knew the Rockford area well, so they stopped at a gas station to get directions.  At the gas station, Epps got into the passenger seat of her vehicle, and Harris got into the driver's seat.  Harris then drove to the apartment complex while talking on Snapchat.

¶ 13    When they arrived at the complex, the person who had been talking to Harris, whom Epps identified as defendant, said he could see them, so Harris stopped the car.  Harris exited the vehicle and talked with defendant, as Epps remained in the passenger seat.  At one point, Epps lowered her window and told Harris that they needed to leave so she could change her son's diaper.  When

Harris responded that they would leave in a minute, Epps began looking at her cell phone. Shortly thereafter, Epps looked up from her phone and saw a man wearing a white shirt walking toward them. The man "walked right up to [Harris] and he started shooting." Epps did not see a gun, but she saw that the man shot once but did not hit Harris. Harris then ran in front of Epps's car and the man shot again. Epps got into the driver's seat, drove outside the complex, and called the police. Later, Epps heard sirens, and she flagged down an officer.

¶ 14 At the police station, from a series of photographs, Epps identified defendant as the person she and Harris met at the apartment complex.

¶ 15 Epps testified that she observed that Harris and defendant were having a normal conversation, when "all of a sudden" someone approached and began shooting. She could not identify the shooter, as she was focused on keeping her son safe. After the shooting, Epps saw the shooter take off running, while defendant "stood there." Epps could not hear the conversation between Harris and defendant. Although she saw the shooter as he approached her car, she was "not sure what he looked like." Epps told police that the shooter was a little taller than Harris and that he wore a white shirt. She acknowledged that she might also have told police that the shooter was skinny but could not recall at trial.

¶ 16 Epps testified that the shooter "walked up, he pulled the gun out of his pants, and he shot." She also testified before the grand jury that the shooter "went straight up to [Harris] and the other guy was still standing there and they kind of tussled and he shot once, but the first shot didn't shoot [Harris] so [Harris] tried to run." Epps testified that she was not certain when the tussle occurred because it all happened very fast.

¶ 17 During cross-examination by Curry, Epps testified that, although she left the scene before the two men did, she believed the shooter and defendant were together "[b]ecause the guy walked

up and immediately tried to attack [Harris]. He did nothing to the other person." The prosecutor elicited on re-direct that, when the shooter approached the men, defendant "literally just stood there" and did not raise his hands. Defendant's attorney elicited that the shooter did not shoot at either defendant or Epps, but Epps believed the shooter did not know she was in the car.

¶ 18                                    3. Detective Mark Jurasek

¶ 19    Winnebago sheriff's detective Mark Jurasek administered the photo lineup to Epps on September 24, 2018. He was an "independent administrator" and did not know why Epps was viewing the lineup or what photographs were included in it. When viewing the lineup, Epps "immediately became very upset." She was visibly shaken and told Jurasek that she did not "ever want to see that man again." (Epps identified defendant.)

¶ 20                                    4. Detective Heath Engelkens

¶ 21    Winnebago sheriff's detective Heath Engelkens testified that, on September 25, 2018, he participated in an interview of defendant at the police station. Defendant was Mirandized and agreed to speak to Engelkens.

¶ 22    Defendant told Engelkens that, on the day of the shooting, he met with someone from Chicago. He did not know the man's name but knew him as "Turnip," the man's username in Snapchat, which was how they communicated with each other. Defendant told Engelkens that he met with Harris to "crack cards," which he explained as exchanging credit cards. Defendant was to provide Harris with a card, and Harris would then use the card to extract funds from an account, which they would later split. Defendant met Harris through Snapchat when Harris appeared as a "suggested friend" in the Snapchat application. Defendant had met with Harris to crack cards on two prior occasions several months prior to the date of the shooting. The first time that defendant and Harris met, they exchanged a card, and Harris communicated to defendant that things had not

worked out well. They met again to exchange additional information and another card. Defendant set up the meeting on the date of the shooting, suggested they meet at the Great Oaks apartment complex, and provided Harris the address through Snapchat. Defendant told Engelkens that he and Harris communicated through video chat, in addition to instant messaging. When Harris arrived at Great Oaks, defendant noticed that he was with a woman whom he did not recognize.

¶ 23 Defendant also told Engelkens that he and Harris had been speaking to each other for two or three minutes when someone came up from behind him, although, at one point, defendant also told Engelkens that the man had approached them from the side. The man said, "Give me everything," and defendant froze and put up his hands. Defendant then ran and heard two shots. He later learned that Harris had been killed. Defendant maintained that he did not know the shooter and described him as a black male with long hair and possibly a beard and wearing a white t-shirt.

¶ 24 According to Engelkens, defendant's demeanor was "up and down" throughout the interview. He was sometimes calm and other times raised his voice. Defendant also told Engelkens that he did not call 911 after the shooting, nor did he mention the shooting to anyone else when he later met with several people.

¶ 25 Defendant consented to a search of his phone and Snapchat account, but he did not tell Engelkens that he had deactivated his Snapchat account. He told Engelkens that he wanted to help the police but feared for his family's and unborn child's safety.

¶ 26                                    5. Deputy Bob Juanez

¶ 27 Winnebago sheriff's deputy Bob Juanez testified as an expert in digital forensic analysis. He extracted call-information data from the cell phone that defendant provided (number 312-483-****). Juanez discovered that there had been contacts between defendant's phone and another

phone (number 815-975-****) both before and after the shooting. Prior to the 7:57 p.m. 911 call, there had been 14 calls between those numbers, and there were six calls after the 911 call.

¶ 28    Before 7:57 p.m., the last call between the numbers was a 5-minute, 10-second call from the 815 number to defendant's phone at 7:33 p.m. After 7:57 p.m., the first call between the phones was a 2-minutes, 41 second call from the 815 number to defendant's phone at 8:03 p.m.

¶ 29    Juanez did not ask defendant if he had only one phone, and Juanez searched the only phone defendant possessed at the time of the interview. Defendant also consented to a search of his Snapchat account, but Juanez was unable to log onto that account because it had been deactivated and the application had been deleted and removed from defendant's phone.

¶ 30    On cross-examination, Juanez testified that he did not know whether defendant possessed the cell phone he had searched when the calls were made and confirmed that the name on the phone was "Jaquala's iPhone." Jaquala and defendant each had an email account registered to the phone. None of the text messages Juanez recovered from the phone referenced a robbery or identified Curry as being associated with the other phone.

¶ 31                                6. Shane Ernst

¶ 32    Shane Ernst, initially identified as a "caseworker" to avoid disclosing to the jury that Curry was on parole when the shooting occurred, testified that Curry's phone number was 815-975-**** and that his address was 6419 Edgewood Road in Machesney Park. On September 23, 2018, Curry called Ernst and verified his phone number, and, on September 25, 2018, Ernst visited Curry and verified his phone number and address. Ernst called the number several times. Curry was required to call Ernst once a week, and he called from the 815 number.

¶ 33                                6. Jaquala Roberson

¶ 34    Jaquala Roberson testified that she had known defendant for 10 years at the time of the shooting and had dated him "a little bit." At 5 or 6 p.m. on September 24, 2018, Roberson picked up defendant from his grandmother's house and they went to a park. Defendant told Roberson that he might go away for years "because of something he was dealing with."

¶ 35    Roberson and defendant drove to an apartment complex on Linden Road because defendant wanted to see if a memorial had been established for the person who died there or whether there was still blood there. On other occasions, Roberson had also visited memorials following a death.

¶ 36    After leaving the apartment complex that day, Roberson and defendant went to get gas and met with Curry, whom she knew as "Chino." Roberson had given defendant an iPhone to use.

¶ 37    On cross-examination, Roberson testified that, when he told her that he might go away for a while, defendant was referring to issues he was having with the mother of his child. Defendant has an iPhone named "Jaquala Roberson's phone," but she did not remember the phone's number. Roberson testified that defendant would call her "from all kinds of numbers," not from just one phone.

¶ 38    Roberson had known Curry from the previous summer, and she sometimes drove him back and forth to work. Because of those rides, Curry owed Roberson gas. When Roberson and defendant briefly met Curry the day after the shooting, there was no prolonged conversation. Curry just gave her the gas that he owed her.

¶ 39                                7. Dr. Mark Peters

¶ 40    Dr. Mark Peters, the forensic pathologist who performed the autopsy of Harris on September 24, 2018, testified that Harris suffered a gunshot wound to the middle of his back and a second grazing gunshot wound to his forearm. He concluded that the wound to Harris's back was an entrance wound to which there was no corresponding exit wound. The bullet entered

Harris's right chest and pierced the lung before lodging just beneath the lung, where Dr. Peters recovered it. He also noticed several abrasions on Harris's body. Dr. Peters concluded that Harris died of a gunshot wound to the back. He did not detect stippling on Harris's body but otherwise could not estimate the range of fire.

¶ 41                    8. Crime Scene Technician Gerard Collins

¶ 42    Winnebago sheriff's department crime scene technician Gerard Collins testified that he investigated and processed the scene shortly after the shooting. Collins processed the car in which Harris had been riding and recovered two shell casings and a bullet fragment from near the car. He also observed a cell phone, clothing, blood, and medical discards in an empty parking space near the car. Collins recovered a cell phone from the car as well as the phone in the parking space.

¶ 43    Collins also went to a residence at 6419 Edgewood Road in Machesney Park, where he processed and collected a gun case and a cell phone that had been located in a bedroom. A bar code on the side of the gun case indicated that it contained a .45-caliber automatic Colt pistol. Inside a bedroom closet, detectives located a credit card reader that was capable of reading magnetic strips on credit cards. Collins photographed a dresser in the bedroom, on top of which was a piece of mail addressed to "Sanchez Akeem Curry" at that address, as well as a box of .45-caliber ammunition that detectives removed from the house. He did not process the gun case for fingerprints or DNA evidence. Nor did he open the case to determine whether it contained a gun. The mail was located in a different room than the gun case and ammunition.

¶ 44                    8. Crime Scene Technician Tim Speer

¶ 45    Winnebago sheriff's department crime scene technician Tim Speer collected the bullet Dr. Peters removed from Harris's body and it was admitted into evidence. He also processed the gun case recovered from the Edgewood Road residence, but did not locate any fingerprints. Inside the

case, Speer discovered foam inserts, a magazine reloader, and a warranty card and instruction manual indicating that the case was for a Taurus .45-caliber semiautomatic pistol. There was no gun inside the case.

¶ 46 Speer also processed the box of Federal brand .45-caliber ammunition that police recovered from the Edgewood Road residence but did not recover fingerprints. He testified that the cartridge cases that detective Collins recovered from the scene bore the same markings, "Federal .45 Auto +P," as the ammunition recovered from the Edgewood Road residence. Speer acknowledged, however, that he could not determine whether the bullets recovered from the scene originated from the ammunition box found at the residence. He also stated that thousands of bullets could fit any particular caliber of gun. Although the head stamp located on the casings recovered from the scene were of the same manufacturer, caliber, and type as casings found at the residence, several thousand ammunition rounds bearing that identical head stamp exist.

¶ 47                                6. AT&T Employee Alan Wong

¶ 48 AT&T employee Alan Wong testified as the custodian of records for the 815-975-**** number. Call records for that phone were admitted into evidence. The date range for the records began at midnight on September 20, 2018, through 3 p.m. on September 28, 2018. The records indicated that Curry (of 6419 Edgewood Road in Machesney Park) was the subscriber of the phone. Wong stated that, for every call made, a cell location was recorded. The cell phone was a prepaid phone, and he had no way to determine who had made the calls.

¶ 49 If a SIM card is removed from one phone and put into a different phone, the report would indicate those calls originating from the different device. Wong's report reflected which cell towers detected the phone when a call was made. He testified that a tower detects a phone only when a call is placed.

¶ 50                              9. FBI Agent Joseph Raschke

¶ 51    Special agent Joseph Raschke of the Federal Bureau of Investigation analyzed the activity

associated with the 815-975-**** number and testified as an expert in historical cell-site analysis.

He opined that, between 7 and 8 p.m. on September 23, 2019, the phone activity was consistent

with this phone traveling from the area near Edgewood Road in Machesney Park toward the area

in Rockford where the shooting occurred.  When the phone's activity resumed at 8:03 p.m., the

activity was consistent with the phone traveling back toward the area of Edgewood Road.  The

State rested.

¶ 52                              C. Defendants' Cases-in-Chief

¶ 53                              1. Colton Schwach

¶ 54    Curry called Colton Schwach, who testified that he resided at the Great Oaks complex on

the date of the shooting.  When he pulled into a parking space that evening, Schwach noticed two

men standing by some trees.  One man was in front of him to his right and another man was off to

his left and across the street.  He estimated that was a 30-to-40-foot distance between the men.

Schwach testified that he only very briefly saw their faces and could not recall their physical

attributes, since it had been a long time since the shooting.

¶ 55    Schwach gave a statement to police after the shooting and was shown a photo lineup but

could not identify the lineup at trial because it had "been too long."  He believed that both men

were skinny and "decently tall."  One of the men stood between Schwach's car and the trees behind

the apartment building, and the other man spoke on the phone while pacing back and forth.  The

two men "vaguely" looked at each other, but they were looking in the general direction of each

other.  The first man "was pretty much completely staring at the guy on the phone."  When

Schwach exited his car, the two men walked behind the apartment building. Schwach remained

inside his apartment for about 10 minutes before he went outside and heard two gunshots. He recalled telling a police detective that, as he approached his apartment, he noticed a black man wearing a white shirt standing impatiently. (Both Curry and defendant are black.) He also remembered that the two men were not standing near any specific car in the parking lot. Police officers showed Schwach photographs, but he did not identify anyone.

¶ 56                                     2. Deputy Sean Hughes

¶ 57    Winnebago sheriff's deputy Sean Hughes assisted in the execution of the search warrant at 6419 Edgewood Road in Machesney Park on October 2, 2018. Police officers located various pieces of contraband throughout the house, and it appeared to Hughes that each of the people living in the house had access to every room in the house. The doors inside the house were open and "[a]nybody could walk around in the house." Hughes did not know about the living arrangements of the residents. He testified that police recovered a cell phone from the house. Hughes did not know to whom it belonged. Police also recovered items of clothing from the house, which Hughes believed belonged to Curry.

¶ 58                                         3. Shane Ernst

¶ 59    Curry recalled Ernst, who clarified that he was Curry's parole agent and that Curry had been on parole at the time of the shooting. Curry's ankle monitor and the accompanying receiver recorded certain data. If the ankle monitor was more than 150 feet from the receiver, the records would say "unauthorized leave." If the receiver was unplugged from its power source for more than eight seconds, the records would say "power loss." When it was plugged in again, the records would say "power restore." If the device detected that the receiver was moving, it would record "receiver motion event," and when the receiver stopped moving for more than 16 seconds, the records would say "receiver stationary event." If the system recorded a motion event, that meant

that the receiver was definitely moved. However, the lack of a motion event did not definitely mean that the receiver was *not* moved. Ernst explained that it was possible that the system would not record gentle movements, such as "if you're driving gently enough and you didn't jostle the box enough." The system instead would record "jarring motions."

¶ 60 The records associated with Curry's device reflected a "power loss," a "receiver motion event," and a "power restore," all at 6:46 p.m. on September 23, 2018. According to Ernst, this indicated that Curry's device was unplugged, moved, and then plugged into a separate power source such as an automobile.

¶ 61 The next recording for Curry's device was a "receiver stationary event" at 7:34 p.m. This meant that, between 6:46 and 7:34 p.m., defendant's device was in constant motion and was constantly powered. The next recording was an "unauthorized leave" at 7:47 p.m., which meant that Curry went more than 150 feet from the receiver. At 7:57 p.m., Curry came back within 150 feet of the receiver, which was reflected as an "unauthorized enter." Also at 7:57 p.m., another "receiver motion event" was recorded. At 8 p.m., the records indicated a "receiver stationary event, which lasted until 8:36 p.m. At 8:36 p.m., the records showed a "power loss," a "receiver motion event," and a "power restore." Then, at 8:37 p.m., there was a "receiver stationary event" that lasted until the next day. This meant that Curry's device was unplugged at 8:36 p.m., was set down somewhere, and was then plugged back in.

¶ 62 Ernst testified that Curry was permitted to be out of range on weekends from 10 a.m. to 2 p.m., as well as Monday through Friday during the day, because he worked.

¶ 63                                    4. Bob Juanez

¶ 64 Defendant recalled deputy Juanez, who testified that, on October 2, 2018, he participated in the execution of the search warrant on phone number 815-975-****. Juanez believed that the

phone number belonged to a phone used by Curry, which had been located in defendant's possession at the District Bar and Grill. Deputy Juanez did not participate in the search of search of Curry's residence, but he knew that a cell phone had been located there. The phone contained messages to a user named "Chino," whose number was listed as 779-772-****. Juanez knew "Chino" to be Curry.

¶ 65                                    C. Verdict and Subsequent Proceedings

¶ 66    At the conclusion of the testimony, the court dismissed the mob action charge, and the parties agreed that defendant was subject to a 15-year enhancement for first-degree murder committed while armed with a firearm under accountability principles. *People v. Rodriguez*, 229 Ill. 2d 285, 293-96 (2008). The court denied defense counsel's motion for a directed verdict, though it commented that the case was "closely-balanced."

¶ 67    The jury found defendant guilty of first-degree murder and determined that the allegation that defendants were armed with a firearm was proven, as was the allegation that Curry personally discharged a firearm that proximately caused death to another person. On January 23, 2020, the court denied defendant's motion for judgment notwithstanding the verdict or for a new trial.

¶ 68    At the sentencing hearing, the State sought a sentence of between 50 and 60 years' imprisonment, in addition to the mandatory statutory 15-year enhancement. Defense counsel argued that the minimum term of 35 years' imprisonment was appropriate. Defendant gave a statement in allocution.

¶ 69    The trial court sentenced defendant to 40 years' imprisonment, in addition the 15-year statutory enhancement, for a total term of 55 years. It found little evidence of defendant's rehabilitative potential, as he had two prior felony convictions. The court also emphasized the premeditated nature of the offense and the importance of deterrence. In announcing the sentence,

the court told defendant that "[t]he only reason why I'm not giving you [a] more severe sentence is because of your age. I'm hopeful that in the time that you'll spend in the Department of Corrections, which will be the majority of your life, you're able to do something constructive and productive with yourself."[2]

¶ 70 On March 12, 2021, defendant moved to reconsider sentence, arguing that his sentence was excessive based on the facts of the case, his age, and the fact that he was not the shooter. The court reduced defendant's aggregate sentence to 50 years' imprisonment. Defendant appeals.

¶ 71                                   II. ANALYSIS

¶ 72                         A. Sufficiency of the Evidence

¶ 73 Defendant argues first that the evidence was insufficient to sustain his conviction for first-degree murder. For the following reasons, we reject his claim.

¶ 74 In reviewing the sufficiency of the evidence to sustain a conviction, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Thomas*, 178 Ill. 2d 215, 231-32 (1997). The trier of fact must "resolve conflicts in the testimony, *** weigh the evidence, and *** draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. We will not substitute our judgment for that of the trier of fact on the weight to be given the evidence or the credibility of the witnesses. *Thomas*, 178 Ill. 2d at 232. The standard in *Jackson* applies when reviewing a finding that a defendant was guilty through an accountability theory. *People v.*

---

[2]Curry's sentencing range was 45 years to life in prison, and the court sentenced him to life in prison.

*Williams*, 193 Ill. 2d 306, 338 (2000). "Whether a person is accountable and guilty of the offense charged may be proved by circumstantial evidence as in other cases." *People v. Manley*, 1 Ill. App. 3d 693, 696 (1971).

¶ 75 A person commits first-degree murder if, in performing the acts that cause a death, "he or she *** intends to kill or do great bodily harm to the victim or another individual, [or] knows that the acts will cause the victim's or another's death, or knows the acts create a strong probability of death or great bodily harm to the victim or another." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 59.

¶ 76 "Accountability is not a crime in and of itself but, rather, a mechanism through which a criminal conviction may result." *People v. Pollock*, 202 Ill. 2d 189, 210 (2002). A person is legally accountable for the conduct of another person when "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2020). "Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability." *Id.* Words of agreement are not required to prove a common design or purpose between codefendants; a common design may be inferred from the circumstances surrounding the crime. *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996).

¶ 77 The intent of subsection (c) of the accountability statute is to incorporate the principle of the common-design rule. *People v. Terry*, 99 Ill. 2d 508, 515 (1984). Thus, to prove that a defendant possessed the intent to promote or facilitate the crime, the State may present evidence that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common

criminal design. *In re W.C.*, 167 Ill. 2d 307, 337 (1995). Under the common-design rule, if "two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." *Id.*

¶ 78 In determining a defendant's legal accountability for a crime, the trier of fact may consider the defendant's presence during its commission, the defendant's continued close association with other offenders after its commission, the defendant's failure to report the crime, and the defendant's flight from the scene. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). "Evidence that a defendant voluntarily attached himself [or herself] to a group bent on illegal acts with knowledge of its design supports an inference that he [or she] shared the common purpose and will sustain his [or her] conviction for an offense committed by another." *In re W.C.*, 167 Ill. 2d at 338.

¶ 79 Defendant argues that there was no direct evidence establishing his guilt, which was dependent on the sufficiency of the State's circumstantial evidence. The State, defendant asserts, relied on unsupported inferences and assumptions, and he asks this court to reverse his conviction. According to defendant, the State attempted to show that he and Curry were engaged in a criminal scheme to kill Harris, whereby defendant lured him to the apartment complex so that Curry could shoot him. Defendant, Curry, and Harris were involved in a scheme involving fraudulent credit card transactions. Defendant had contacted Harris and met with him at the Great Oaks apartment complex in Rockford shortly before the shooting. As defendant and Harris were talking in the parking lot, a gunman alleged by the State to have been Curry approached them and shot Harris. Defendant told police that he "froze" when the shooting occurred, and this was confirmed by Epps, who testified that defendant "just stood there" during the shooting. The State also presented

evidence that there had been cell phone communications between phones used by Curry and defendant both before and after the shooting.

¶ 80    Defendant contends, however, that the State offered no explanation or evidence to demonstrate that Curry's shooting of Harris was part of any common criminal scheme that defendant purportedly shared with Curry. Even if the State showed that defendant contacted Curry prior to Curry's killing of Harris, he maintains, the evidence failed to show that Curry's act of shooting Harris was anything more than an unforeseeable spontaneous act and one that Curry undertook independent of any alleged common scheme, and such an act cannot be imputed to defendant. Defendant argues that there was no direct evidence of guilt and the inferences generated by the circumstantial evidence were not so substantial as to rationally permit the jury to find defendant's communications with Curry were to arrange or facilitate the shooting. Absent any evidence of a prior plan between Curry and defendant to shoot Harris, the State, defendant contends, failed to prove that the shooting was not spontaneous and unforeseeable.

¶ 81    We reject defendant's arguments and conclude that the evidence was sufficient to sustain his conviction. Epps testified that, on September 23, 2018, she drove with her son and Harris from Chicago toward Freeport and that Harris, who had been communicating with someone on Snapchat, wanted to stop at an apartment complex in Rockford to pick up a bank card from the person with whom he had been speaking on Snapchat. Engelkens testified that defendant told him that he met with Harris to "crack cards," *i.e.*, exchange credit cards so that Harris could extract funds from an account, which they would later split. The person on Snapchat provided the Rockford address.

¶ 82    Schwach, a resident at the complex, testified that, on the date of the shooting, he pulled into a parking space that evening and saw two men standing by some trees. One of the men spoke

on the phone while pacing back and forth, and the other man stared at the man on the phone. He told a detective that, as he approached his apartment, he noticed a man wearing a white shirt (which was consistent with Epps's description of the shooter and with defendant's statement to Engelkens that the shooter wore a white t-shirt) and standing impatiently. When Schwach exited his car, the men walked behind the apartment building.

¶ 83    When Epps and Harris arrived in Rockford, the person who had been talking to Harris, whom Epps identified as defendant, said that he could see them, and Harris exited the car and talked with defendant. Shortly thereafter, Epps, who had remained in the car, looked up from her phone and saw a man in a white shirt walk toward them and start shooting. Defendant told Engelkens that he "froze" when the shooter appeared, and this was consistent with Epps's testimony that defendant just "stood there." (Defendant told Engelkens that he raised his hands, but a reasonable jury was free to disregard this.) Epps interpreted the fact that the shooter "did nothing" to defendant as meaning that defendant knew the shooter (or the shooter knew him). Indeed, a reasonable jury could have found that defendant merely stood there because he knew that the shooter, *i.e.*, Curry, was only going to shoot Harris. Defendant's actions, thus, do not support his claim that Curry's act of shooting Harris was an independent spontaneous act by Curry independent of any alleged common scheme.

¶ 84    Even aside from Epps's testimony, a reasonable jury could have determined that defendant's actions after the shooting supported a finding of accountability for the murder. After the shooting, defendant left the scene and did not call 911 or mention the shooting to anyone. He also, as we discuss below, continued to communicate with Curry by phone. The day after the shooting, he went with Roberson to the apartment complex because he wanted to see if a memorial had been established or if there was still blood there. Also on the day after the shooting, defendant

saw Curry, and Roberson testified that they met with Curry so that Curry could pay her back the gas he owed her. He also told Roberson that he would go away for years because of something he was dealing with. Defendant deleted his Snapchat application and account from his cell phone, which prevented police from accessing the application that defendant used to communicate with Harris. See *Taylor*, 164 Ill. 2d at 141 (in assessing accountability, factfinder may consider the defendant's presence during crime's commission, the defendant's continued close association with other offenders after its commission, the defendant's failure to report the crime, and the defendant's flight from the scene).

¶ 85     A reasonable jury could have also determined that defendant lied to Engelkens when he told the detective that he did not know the shooter and that this reflected a consciousness of guilt. In this respect, the cell phone evidence was highly damaging to defendant. Digital forensic analyst Juanez extracted data from the 312-483-**** cell phone number that defendant provided and discovered that there had been 14 calls between that number and the number 815-975-**** (which parole agent Ernst identified as Curry's number that Curry had verified on the day of the shooting and for which AT&T employee Wong identified Curry as the subscriber) prior to 7:57 p.m., the time of Epps's 911 call, on the day of the shooting. Further, there were six calls after the 911 call. The last call before 7:57 p.m. occurred at 7:33 p.m. and lasted 5 minutes and 10 seconds. The first call between the phones after 7:57 p.m. was a 2-minute, 41-second call at 8:03 p.m. Agent Raschke testified that the 815-975-**** number's activity between 7 and 8 p.m. on the night of the shooting was consistent with the phone traveling from the area near Edgewood Road in Machesney Park (*i.e.*, Curry's residence) toward the area in Rockford where the shooting occurred. Also, when the phone's activity resumed at 8:03 p.m., the activity was consistent with the phone traveling back toward the area of Edgewood Road.

¶ 86    The ankle monitor testimony was consistent with a finding that Curry left his home on the evening of the shooting. Ernst testified that the data showed that, at 6:46 p.m. on the day of the shooting, Curry's device reflected a power loss, a receiver motion event, and a power restore, which he explained indicated that Curry's device was unplugged, moved, and then plugged into a separate power source such as an automobile. Between 6:46 p.m. and 7:34 p.m., the device was in constant motion and constantly powered. The next recording was an unauthorized leave at 7:47 p.m., which meant that Curry went more than 150 feet from the receiver. He came back within 150 feet at 7:57 p.m.

¶ 87    Curry lived at 6419 Edgewood Road in Machesney Park, where detectives located a credit card reader capable of reading magnetic strips on credit cards (and highly relevant given the arranged exchange of a credit card between defendant and Harris and Epps' testimony that Harris's meeting with defendant was to exchange credit cards), mail addressed to "Sanchez Akeem Curry," and a box of Federal brand .45-caliber ammunition (which bore the same markings as the cartridge cases recovered from the scene), and a gun case for a Taurus .45-caliber semiautomatic pistol.

¶ 88    Engelkens testified that defendant had explained that he met Harris through Snapchat and, several months prior, they met on two prior occasions to crack cards. The first time, however, things had not worked out and they met again to exchange additional information and another card. A reasonable jury could have found that defendant's and Curry's scheme was to lure Harris to the complex by offering a credit card from which Harris would plan to extract money, as they had previously done, and to shoot Harris. Defendant offers no explanation for Curry's presence if the purpose of the meeting with Harris was to merely provide Harris with a credit card. The cell phone data showed that defendant and Curry communicated heavily both before and after the shooting and belies defendant's claim that he had no prior knowledge that Curry would shoot Harris. A

reasonable jury could have determined that the phone communications and Curry's presence reflected a common scheme to shoot Harris, not an independent spontaneous act by Curry, as defendant suggests. It could also have reasonably found that defendant and Curry were seeking revenge against Harris for failing to provide the anticipated financial gains during their prior credit card exchange.

¶ 89 In summary, viewed in the light most favorable to the prosecution, a reasonable jury could have found defendant guilty of first-degree murder under a theory of accountability.

¶ 90                                    B. Severance of Trials

¶ 91 Next, defendant argues that the trial court abused its discretion in denying his motion to sever his trial from Curry's trial. He contends that their defenses were antagonistic, where Curry, during cross-examination of Epps, the State's sole eyewitness, elicited that Epps believed that defendant and the shooter were working together. Defendant contends that, in denying his motion to sever, the court's action was unfair because it reinforced the State's case and undercut his defense, which was that he and Harris had arranged to meet and, while they spoke, a person whose identity was unknown to defendant approached them and shot Harris.

¶ 92 A ruling on a motion for severance rests within the trial court's discretion. *People v. Murphy*, 93 Ill. App. 3d 606, 609 (1981). It will not be reversed on appeal absent an abuse of that discretion. *People v. Bean*, 109 Ill. 2d 80, 93 (1985). A court abuses its discretion where its ruling is unreasonable. *People v. Anderson*, 367 Ill. App. 3d 653, 664 (2006).

¶ 93 "Illinois recognizes that when codefendants' defenses are so antagonistic to each other that one of the codefendants cannot receive a fair trial jointly with the others, severance is required." *Bean*, 109 Ill. 2d at 93. There must be actual hostility between the two defenses. *Id.* "It is incumbent upon the defendant moving for a separate trial to demonstrate prior to trial how he [or

she] would be prejudiced by a joint trial." *Murphy*, 93 Ill. App. 3d at 609. "Actual hostility occurs when there is 'true conflict, such that each defendant professes his [or her] own innocence and condemns the other.' " *People v. Rodriguez*, 289 Ill. App. 3d 223, 235 (quoting *People v. Lovelady*, 221 Ill. App. 3d 829, 836 (1991)). Mere inconsistency or contradiction between a codefendant's theory and the defendant's theory is not sufficient. *Id.*

¶ 94    "The 'mere contradiction in testimony of two defendants as to what happened on the day of the crime does not render defenses sufficiently antagonistic to constitute reversible error.' " *Lovelady*, 221 Ill. App. 3d at 836 (quoting *People v. Lekas*, 155 Ill. App. 3d 391, 408 (1987)). For example, actual hostility is not shown where "one defendant claims an alibi defense and the other defendant asserts a reasonable doubt [defense], but at no time do the defendants become rivals or accuse each other." *People v. Rice*, 286 Ill. App. 3d 394, 403 (1996); see also *Rodriguez*, 289 Ill. App. 3d at 236-37 (defenses antagonistic where codefendant's cross-examination of occurrence witnesses, who recanted their initial statements that codefendant was the shooter and instead implicated the defendant; "[t]he net result produced the State and [codefendant] on one side and [the] defendant on the other with respect to the occurrence witnesses.").

¶ 95    Initially, the State responds that defendant has forfeited his argument because he did not object during Epps's testimony or ask the trial court to reconsider its ruling on his motion to sever. We disagree. Although he did not object during Epps's testimony or move to reconsider the severance motion, we note that defendant argued in his posttrial motion that the court erred in denying his motion to sever. Thus, the argument was preserved.

¶ 96    Forfeiture aside, the State argues that defendant's and Curry's defenses were not antagonistic. During its direct examination of Epps, the State notes, it elicited that defendant and the shooter were together at the same location when the shooting occurred. Epps testified that the

shooter walked over to Harris and defendant and fired two shots at Harris. During cross-examination by defendant's attorney, Epps further testified that defendant, the shooter, and Harris were "all in close proximity to each other" at the time of the shooting. Thus, the State reasons, prior to Curry's cross-examination of Epps, the jury had already heard testimony that defendant and the shooter were together at the crime scene and the jury could have reasonably inferred that they knew each other. The additional cross-examination by Curry, the State maintains, simply expounded on Epps's earlier testimony that defendant and the shooter were in close proximity when Harris was shot. The State also notes that Curry never tried to shift the blame to defendant. Finally, the State argues that any prejudice to defendant was harmless, because it was far outweighed by additional incriminating evidence that defendant and Curry were engaged in a common criminal design to kill Harris. Specifically, the State points to the evidence that, on the day of the shooting and before the shooting occurred, there were 14 cell phone calls between defendant's cell phone and Curry's cell phone. Also, the cell site analysis established that, shortly before the offense, Curry's phone traveled from the area of his residence in Machesney Park to the area of the shooting. After the shooting, the State notes, six additional calls were made between the phones that evening. Also, the next day, defendant and Curry met in person.

¶ 97　　We agree with the State that the any error in denying defendant's motion to sever was harmless. See *People v. Smith*, 172 Ill. App. 3d 94, 106 (1988) (applying harmless-error analysis to assessing court's failure sever). Under a harmless-error analysis, the State must prove beyond a reasonable doubt that the result would have been the same absent the error. *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). The improper admission of evidence is harmless where there is no reasonable probability that, if the evidence had been excluded, the outcome would have been different. *People v. Lindsey*, 2013 IL App (3d) 100625, ¶ 39. "When deciding whether error is

harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008).

¶ 98   Curry elicited during his cross-examination of Epps that she believed the shooter and defendant were together "[b]ecause the guy walked up and immediately tried to attack [Harris]. He did nothing to the other person." Preliminarily, we note that defendant does not explain how Epps's testimony that she believed that defendant and Curry were together would have been kept out had defendant had a separate trial. The State could have elicited this testimony from Epps.

¶ 99   In any event, we conclude that, assuming the motion to sever should have been granted, the trial court's failure to do so was harmless beyond a reasonable doubt because the evidence of a common criminal design was overwhelming. Defendant himself testified that he "froze" when the shooter appeared. Thus, the jury heard that he stood there and it, of course, knew that he was not shot. It could have reasonably and easily inferred, as did Epps, that defendant and Curry were together. That is, it could have made a reasonable inference from the same facts that Epps had before her.

¶ 100   As we noted in our discussion concerning the sufficiency of the evidence, the heavy volume of calls between defendant's and Curry's cell phones immediately before and after the shooting reflect that they worked together to lure Harris to the apartment complex so that Curry could shoot him. Further, defendant's actions after the shooting clearly showed a consciousness of guilt, including his failure to contact police, his failure to mention the shooting to anyone, his visit to the

scene with Roberson, his meeting with Curry the day after the shooting, and his removal of the Snapchat account from his phone.

¶ 101   In summary, there was no prejudice from any error in denying defendant's motion to sever.

¶ 102                                    C. Sentence

¶ 103   Defendant's final argument is that his 50-year aggregate sentence was excessive, where he was not the shooter but was convicted under an accountability theory.   He suggests that the minimum 35-year aggregate sentence would provide adequate retribution yet still provide him the possibility of release at an age where he would be unlikely to reoffend.  For the following reasons, we reject defendant's claim.

¶ 104   A sentence will be disturbed on appeal only if the sentencing court abused its discretion. *People v. Tye*, 323 Ill. App. 3d 872, 887 (2001).  A reviewing court defers to the trial court's decisions concerning sentencing and presumes that the trial court considered only appropriate factors in sentencing unless the record affirmatively shows otherwise.  *People v. Lurks*, 241 Ill. App. 3d 819, 827 (1993).

¶ 105   The Illinois Constitution requires that penalties be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Center*, 198 Ill. App. 3d 1025, 1032-33 (1990).  This constitutional mandate calls for the balancing of the retributive and rehabilitative purposes of punishment.   *Center*, 198 Ill. App. 3d at 1033.   This balancing process requires careful consideration of all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it.  *Id.*  The trial court is not required to detail precisely

for the record the exact process by which it determined the penalty, nor articulate its consideration of mitigating factors, or make an express finding that defendant lacked rehabilitative potential. *People v. Redmond*, 265 Ill. App. 3d 292, 307 (1994). The seriousness of the crime is the most important factor in determining an appropriate sentence, not the presence of mitigating factors such as the lack of a prior record, and the statute does not mandate that the absence of aggravating factors requires the minimum sentence be imposed. *Id.*

¶ 106 Defendant notes that he was 25 years old at the time the shooting occurred. He contends that the 35-year minimum sentence, under which he would be incarcerated until he is at least 60 years old, would allow him the opportunity to be a productive member of society while not be a threat to it. His 50-year sentence, defendant argues, will allow his earliest release at age 75, making it unlikely that he will ever be released and have the chance to reenter society. See *People v. Buffer*, 2019 IL 122327, ¶¶ 40-41 (sentence of more than 40 years constitutes *de facto* life sentence for a 16-year-old juvenile). This undermines the constitution's mandate, he urges, to impose a sentence with the goal of restoring the offender to useful citizenship. He also notes that he lacked a significant prior violent criminal history—consisting of attempt armed robbery when he was 17 and an aggravated driving under the influence conviction. Defendant asserts that his conduct was the result of circumstances unlikely to recur should he be released earlier than age 75.

¶ 107 We reject defendant's argument. Defendant faced a sentencing range of 35 to 75 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2020); 730 ILCS 5/5-8-1(a)(1)(d)(I) (West 2020). The court initially sentenced him to the midpoint of the range—55 years—but, upon reconsideration, reduced the aggregate sentence to 50 years. In announcing the sentence, the court told defendant that "[t]he only reason why I'm not giving you [a] more severe sentence is because of your age. I'm hopeful that in the time that you'll spend in the Department of Corrections, which

will be the majority of your life, you're able to do something constructive and productive with yourself."

¶ 108   Contrary to defendant's assertion that he lacks a significant criminal history, in addition to the prior felonies that defendant notes, his criminal history includes 12 months' probation for retail theft and resisting a peace officer; 18 months' conditional discharge for resisting a peace officer; and two convictions for driving on a suspended license.  Defendant's record supports the court's determination of little rehabilitative potential.  Despite serving time in custody on prior occasions, defendant failed to demonstrate that he was rehabilitated, and, instead, he participated in the premeditated shooting of Harris.  The trial court reasonably emphasized the premeditated nature of the offense and the importance of deterrence.  Defendant and Curry lured Harris to the apartment complex, and, while defendant spoke to him, Curry shot Harris in the back.

¶ 109   The trial court did not abuse its discretion in sentencing defendant to 50 aggregate years' imprisonment.

¶ 110                                    III. CONCLUSION

¶ 111   For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 112   Affirmed.