2026 IL App (1st) 240662-U

FIRST DIVISION
March 23, 2026

No. 1-24-0662

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the Circuit |
| | ) Court of Cook County. |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) No. 12 CR 10109 |
| | ) |
| NATHAN BURTIN, | ) |
| | ) Honorable William G. Gamboney, |
| Defendant-Appellant. | ) Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*: We affirm the trial court's order dismissing defendant's postconviction petition at the second stage. Defendant failed to make a substantial showing that he received ineffective assistance from his trial counsel. Defendant failed to demonstrate that trial counsel provided objectively unreasonable assistance or that he was prejudiced by any alleged error. Defendant also failed to show that postconviction counsel provided unreasonable assistance.

¶ 2    Defendant Nathan Burtin shot and killed Maurice Matthews. Defendant was charged with and convicted of first-degree murder. During his bench trial, defendant testified and claimed he acted in self-defense. Defendant filed a postconviction petition arguing that his trial counsel was ineffective. The trial court dismissed the postconviction petition at the second stage. Defendant

now appeals the order dismissing his postconviction petition, and he also argues that his postconviction counsel was ineffective. For the following reasons, we affirm.

¶ 3                                    BACKGROUND

¶ 4      Defendant met a female coworker, Sandessa Atkins, when they worked together at Comcast. They dated for about 6 months before Atkins broke off the relationship in August 2011. For the first couple months after their relationship ended, they were still friendly and had contact over the phone and occasionally in person. Beginning in October 2011, defendant began engaging in strange behaviors towards Atkins that essentially amounted to stalking. For example, defendant would call Atkins and tell her he could see her, even though she had not told him where she was located.

¶ 5      On two occasions in February 2012, Atkins' car was vandalized. On the first occasion, she saw defendant standing by her car with the trunk open and he was doing something inside there. When she approached, he looked at her, closed the trunk, and walked away. She discovered that the charging cords for her electronic devices that were inside the car had been cut. On the second occasion, Atkins' mother, who she lived with, returned home and saw defendant doing something to the tires on Atkins' vehicle. Atkins walked outside and saw what she believed to be defendant's vehicle driving away. When Atkins and her mother examined her vehicle, they noticed that the back two tires had been flattened. She filed police reports on both occasions.

¶ 6      Although Atkins started to become afraid of defendant, they were still somewhat cordial and still had some phone contact with each other. Defendant, however, would call Atkins incessantly, and if she did not answer he would call her from other phone numbers.

¶ 7      Between February and April 2012, Atkins moved to a new residence and did not tell defendant where she was residing. On April 29, 2012, Atkins and defendant spoke on the phone. Defendant sounded suicidal, according to Atkins. Defendant told Atkins that if she would not be with him, he was going to kill or harm himself. During the course of that conversation, defendant mentioned the street name where Atkins was residing, even though she had never informed him of her new address. When Atkins questioned defendant about how he knew her street, he told her that he had used his employee access at Comcast to find out where she was living.

¶ 8      On May 2, 2012, Atkins and defendant spoke on the phone again. Atkins was hanging out at a park with some friends and defendant called her multiple times. One of Atkins' male friends answered one of the phone calls, but the content of that call was not disclosed. When Atkins left the park, she drove home. She drove into the alley to park in her garage. Her garage door was broken, so it needed to be manually opened. When she attempted to open the door, it was locked. She knocked on the garage door and her cousin, Maurice Matthews, opened the door for her.

¶ 9      Matthews and Atkins had a very close relationship and, even though they were cousins, they were more like siblings. Matthews was at Atkins' house every day. Matthews had a key to Atkins' home and had permission to be at her house.

¶ 10     When Matthews opened the garage door for Atkins, he was there with a woman she did not know. The woman later revealed that she and Matthews were together having sex in the garage before Atkins arrived. Matthews' car was parked in the garage, so he needed to move it outside and park in a spot in the alley so that Atkins could park her car inside. After Matthews moved his car but before Atkins had pulled into the garage, they began talking while Matthews was standing outside the passenger side of her car. As they were talking, Atkins saw defendant drive past her through the alley. He came from the direction she was facing but did not stop.

About a minute later, however, defendant drove down the alley again in the same direction. He stopped his car alongside Atkins' vehicle so that the driver's side windows were right next to each other.

¶ 11     Atkins was shocked to see defendant at her home. She looked at Matthews. Matthews told defendant, "I'm with her, you need to leave." Defendant reportedly became upset and told Matthews that Atkins would not date someone like him. Matthews walked around from the passenger side of Atkins' vehicle to the driver's side and got between the two cars. Matthews was calmly repeating that defendant needed to leave, but defendant was acting upset and being loud. Defendant then stooped downward for a second, pulled out a gun, and fired a shot at Matthews.

¶ 12     After being shot, Matthews lunged forward and grabbed the gun from defendant's hand. Defendant never got out of his car and, after he was disarmed, he quickly drove away. Both Atkins and the woman who was with Matthews in the garage, Dawn Jones, witnessed the shooting and positively identified defendant as the shooter. Matthews died of a gunshot wound to the left side of his chest which crossed through his left lung, liver, aorta, and right lung before exiting through the right side of his back.

¶ 13     A 911 call was made about one minute after the shooting. The caller identified defendant as the shooter and gave a description of the vehicle he was driving when he fled the scene. Officer Donna Lewis of the Maywood Police Department was on duty when she received a flash message about the vehicle which indicated that the driver was wanted for a shooting that occurred in Chicago. Officer Lewis and her partner spotted the vehicle and stopped it. The officers arrested defendant and took him into custody.

¶ 14    After defendant was arrested, the police found a folded up piece of paper in his wallet with Atkins' address written on it. Defendant also told detectives that he was not at Atkins' house that night and had never been there before. Defendant, who lived in Maywood and was arrested there, told detectives that he was not in Chicago at all on the night of the shooting and was at a friend's house.

¶ 15    A gunshot residue test was performed, and gunshot residue was found on defendant's right hand and the left cuff of his shirt. A Glock Model 17 9mm semiautomatic pistol was recovered from the scene of the shooting. It was loaded with 15 live cartridges, and one fired cartridge was recovered from the scene. Three different DNA profiles were present on the firearm. Both Atkins and Matthews were also found to have gunshot residue on their hands.

¶ 16    Phone records between defendant and Atkins established the dates and times of the communications between them leading up to the shooting. For May 2, 2012, the day of the shooting, the phone records showed that, in the morning, defendant called Atkins twice and sent her one text message between 10:14 a.m. and 10:43 a.m. Atkins called defendant back at 10:44 a.m. and sent him a text message. That night, defendant called Atkins 13 times and sent her 5 text messages between 8:50 p.m. and 11:59 p.m. Atkins texted defendant twice that night at 9:32 p.m. and 9:34 p.m.

¶ 17    At trial, defendant called two character witnesses before testifying on his own behalf. Jeffrey Guilbo testified that he worked with defendant at Comcast and later became defendant's direct supervisor, having contact with defendant every day. Guilbo testified that defendant was being prepared to become a supervisor himself. Guilbo testified that he had never heard anybody talk about whether defendant was a truthful or peaceful person. After Guilbo gave that testimony, defense counsel tried further to elicit testimony about defendant's reputation for being truthful or

peaceful, but the trial court sustained an objection to the testimony because Guilbo had already stated he had never heard anyone discuss those matters. The trial court did, however, permit Guilibo to clarify how he knew defendant's reputation for truthfulness and peacefulness if he had never heard anyone talk about it. Guilbo testified that he knew of defendant's good reputation based on his personal knowledge as he was in the process of preparing defendant to become a supervisor and had been training him and monitoring him during their daily interactions.

¶ 18    Edward Binion was also called as a character witness for defendant. Binion also met defendant through work, but they also had a social relationship, going out together about every other weekend to parties and clubs along with some other friends. Binion testified that he had never heard anyone say anything bad about defendant. When asked by defense counsel if he had ever heard anyone talk about defendant being truthful or peaceful, Binion replied, "Well, no. I never had nobody slander his name or anything like that." When defense counsel inquired further, Binion clarified that he had never had a conversation with anyone about defendant's truthfulness or reputation for peacefulness. Binion, however, testified that he had never heard anyone talk badly about defendant. When asked if he had ever heard anyone talk about defendant being a peaceful or mild person, Binion responded affirmatively before stating under further questioning that he never heard any specific conversations about defendant's reputation.

¶ 19    Defendant testified on his own behalf. He testified that he and Atkins broke up in December 2011 when he went through her phone and discovered that she was seeing someone else. He claimed it was a mutual breakup. Defendant testified that they remained cordial and were beginning to rekindle their relationship in April 2012. He testified that Atkins gave him her new address, and he went to her new apartment on April 28, 2012, where they had a conversation and kissed and hugged each other. Between April 28th and May 2nd, defendant and Atkins

talked on the phone for hours. Defendant testified that there was mutual interest in having those conversations. Defendant denied that he punctured Atkins' car tires. He also denied expressing any thoughts of self-harm or suicide.

¶ 20    Defendant testified that, on the day of the shooting, he and Atkins spoke by phone in the morning and discussed possibly getting together after work. He texted Atkins after he got off work and she replied that she was not home but would call him when she was. Defendant testified that Atkins texted him around 11 p.m. to say that she was home. Defendant then went to Atkins' house. He had her address written down on a piece of paper in his wallet because she had given it to him.

¶ 21    When defendant arrived at Atkins' house, he went into the alley to park. He did not see any parking spots, so he circled back around. When he got back into the alley, he pulled alongside Atkins' car. She was on the phone, so he was sitting there waiting for her to finish so he could ask her where he should park. At that point, a man on the passenger side of Atkins' car began telling him to leave, saying "she's my girlfriend, you should leave." Defendant and the man began trading insults. The man was advancing towards defendant and got between defendant's car and Atkins' car. The man had a look on his face like he was upset and defendant believed the man was going to attack him.

¶ 22    Defendant testified that it looked like the man had something in his hand, though on cross-examination he later stated that he could not see the man's hands. Defendant believed he needed to protect himself and Atkins from this individual. Defendant testified that he got out of his car and grabbed his gun. Defendant kept the gun in his car every day since 2011 following a burglary at his mother's house. He only intended to scare the man with the gun, not shoot him, but he did chamber a round. As he was raising up the gun to point it at the man, the man grabbed

the gun and the gun went off. Defendant dropped the gun and drove away. He testified that he did not remember pulling the trigger and that if he did so, it was unintentional. After he drove away, he called Atkins, and she told defendant that he shot her cousin and was going to jail. He was stopped by police and arrested about 10 minutes later.

¶ 23    Defendant testified that he was in shock when he was arrested, and he admitted that he lied to the police about what happened. He admitted that he told the officers that he was at a friend's house, had not seen Atkins that night, and had not been in Chicago.

¶ 24    The trial court found defendant guilty of first-degree murder. The court stated that it found Atkins to be credible and noted that her testimony was corroborated by her mother and Dawn Jones as well as by the physical evidence. The trial court noted that the phone records refuted some key parts of defendant's testimony and that defendant's testimony was "truly incredible," "ludicrous," and "border[ed] on the absurd." The trial court noted, for example, that defendant testified he pulled out the gun in part to protect Atkins, but then fled the scene leaving her behind with a loaded weapon with the person he believed she needed protection from. The court also found defendant not to be credible when he claimed that he only intended to scare Matthews because he chambered a live round while taking out the weapon and pointing it at the man. The trial court sentenced defendant to 48 years in prison.

¶ 25    Defendant filed a direct appeal in which he argued that his conviction should be reduced to involuntary manslaughter. Defendant argued that there was insufficient evidence to support a first-degree murder conviction and, instead, the evidence could only support an involuntary manslaughter conviction. We concluded that, "viewing the evidence in a light most favorable to the State, a rational trier of fact could find, beyond a reasonable doubt, that defendant intended to kill or do great bodily harm to Matthews or knew that his actions would cause Matthews' death,

or that he knew his acts created a strong probability of death or great bodily harm to Matthews." *People v. Burtin*, 2019 IL App (1st) 170240-U, ¶ 36 (unpublished order under Supreme Court Rule 23).

¶ 26    On September 29, 2020, defendant filed a postconviction petition through retained counsel which is the subject of this appeal. In his petition, defendant raised a single claim—that his trial counsel was ineffective for failing to investigate and call two additional character witnesses. Defendant argued in his petition that counsel should have called Dameon Jones and Kevin Ray to testify in his defense. The postconviction petition was supported by affidavits from Jones and Ray in which they each averred that they have known defendant for many years, know defendant to be a peaceful person who does not lie or cheat, and would have been willing to testify to defendant's truthfulness and good character.

¶ 27    After filing the petition, defendant filed a motion to supplement it. Defendant stated that the Covid-19 pandemic prevented him from being able to deliver his notarized affidavit with the original petition, which he argued provided good cause for his failure to file the petition sooner. The trial court advanced defendant's petition to the second stage.

¶ 28    The State moved to dismiss defendant's postconviction petition, arguing that it was untimely and nonetheless without merit as he failed to meet either requirement to prevail on a claim for ineffective assistance of counsel.

¶ 29    Defendant filed a response to the State's motion to dismiss his postconviction petition in which he raised additional claims not included in his petition: that trial counsel failed to adequately cross-examine Atkins' mother and the medical examiner and that counsel failed to adequately examine the two character witnesses who did testify at trial. Later, defendant filed another supplement to his petition seeking to add another character witness to his postconviction

proceedings. Defendant attached an affidavit from his cousin, Clarissa Carthans. Carthans averred in her affidavit that she grew up with defendant and he is a calm and non-confrontational person. She also stated in her affidavit that defendant was in Bellwood all day on February 28, 2012, so he could not have slashed Atkins' tires that day. Carthans stated that she told defendant's trial counsel this information before trial, but she was never called to testify.

¶ 30     The State responded to defendant's new claims and new affidavit. The State withdrew its argument regarding the timeliness of defendant's petition, but it reiterated that the claims were speculative and lacked merit. The State argued that defendant failed to make a substantial showing of ineffective assistance of trial counsel. The State suggested that trial counsel's decisions regarding which witnesses to call and what questions to ask during cross-examination were purely matters of trial strategy, and that defendant had failed to demonstrate how the testimony of any of the character witnesses would have overcome the overwhelming evidence against defendant or changed the outcome at trial.

¶ 31     The trial court held arguments on the petition and the motion to dismiss, and it later issued a written ruling. The trial court dismissed the petition, concluding that defendant could not establish prejudice, that his allegations were conclusory and speculative, and that the claims consisted of matters of trial strategy. The trial court concluded that defendant had failed to show that any of the new evidence or any of the new claims made by defendant would have altered the outcome at trial. Defendant now appeals the trial court's dismissal of his postconviction petition.

¶ 32                                    ANALYSIS

¶ 33     This appeal concerns the trial court's dismissal of a postconviction petition at the second stage of proceedings under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022)). The Post-Conviction Hearing Act provides a criminal defendant with the right to

challenge his conviction by filing a petition in the circuit court (*id*. § 122-1) and sets forth a process by which a defendant can assert that, in the proceedings that resulted in his conviction, there was a substantial denial of his federal or state constitutional rights (*People v. Hodges*, 234 Ill. 2d 1, 9 (2009)).

¶ 34    The Post-Conviction Hearing Act provides for a three-stage process for adjudicating postconviction petitions. *People v. Harris*, 224 Ill. 2d 115, 125 (2007). At the first stage, the circuit court independently assesses the merits of the petition and may dismiss the petition if it is frivolous or patently without merit. 725 ILCS 5/122-2.1 (West 2022). At the second stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001).

¶ 35    The question raised in an appeal from an order dismissing a postconviction petition at the second stage is whether the allegations in the petition, liberally construed in favor of the petitioner and taken as true, are sufficient to invoke relief under the Act. *People v. Sanders*, 2016 IL 118123, ¶ 31. The circuit court's dismissal of a postconviction petition at the second stage is reviewed *de novo*. *People v. Smith*, 2021 IL App (1st) 181728, ¶ 18.

¶ 36    *Ineffective Assistance from Trial Counsel*

¶ 37    Defendant argues that he made a substantial showing of ineffective assistance of trial counsel in his postconviction petition such that the trial court erred when it dismissed the petition. Defendant argues that trial counsel failed to properly investigate and present character evidence in support of his self-defense claim during trial.

¶ 38    The Constitution of the United States guarantees criminal defendants the right to effective assistance of counsel. U.S. Const. Amend. VI (West 2022). Thus, where a criminal defendant is convicted of an offense but did not receive constitutionally adequate representation, he can seek

relief to vindicate his constitutional right to counsel. *People v. Burnett*, 385 Ill. App. 3d 610, 614 (2008). To be entitled to relief on a claim of ineffective assistance of counsel, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *People v. Scott*, 2015 IL App (1st) 131503, ¶ 27.

¶ 39　We analyze claims of ineffective assistance of counsel by considering the entire record. *People v. Hommerson*, 399 Ill. App. 3d 405, 415 (2010). At the second stage of postconviction proceedings on a claim for ineffective assistance of counsel, the question is whether the petition makes a substantial showing of both the deficient performance and prejudice prongs of the *Strickland* standard. *People v. Towns*, 182 Ill. 2d 491, 507 (1998).

¶ 40　Defendant acknowledges that his presence at the scene of the shooting is not disputed. However, defendant contends that he *did* dispute at trial whether he or Matthews was the initial aggressor and whether his shooting of Matthews was intentional. Defendant argues that the trial largely came down to a credibility contest between himself and the State's witnesses, primarily Atkins, and, thus, evidence of his peacefulness and truthfulness was highly relevant.

¶ 41　Defendant argues that, even though trial counsel attempted to introduce helpful character evidence, counsel's "efforts were lackluster and fell far short of establishing anything useful about [defendant's] character." Defendant suggests that he made a substantial showing of ineffective assistance of counsel where he demonstrated that counsel failed to call additional character witnesses who could have provided more specific and reliable information about his character and where counsel failed to adequately examine the character witnesses who did testify.

¶ 42      Decisions on what evidence to present and which witnesses to call on a defendant's behalf rest with trial counsel and, as matters of trial strategy, are generally immune from claims of ineffective assistance of counsel. *People v. Ward*, 187 Ill. 2d 249, 261-62 (1999). The only exception to this rule is when counsel's chosen trial strategy is so unsound that counsel fails to conduct any meaningful adversarial testing. *Id*. at 262. Trial counsel's performance must be evaluated on the basis of the entire record and not upon isolated instances of alleged incompetence called into question by the defendant. *People v. Flores*, 128 Ill. 2d 66, 107 (1989). Defendant acknowledges that claims such as his are normally insufficient to substantiate a claim of ineffective assistance of counsel, but he argues that trial counsel's failure to properly present character evidence on his behalf was not in any way strategic, it was instead "the product of incompetence and misunderstanding of the law."

¶ 43      Our review of counsel's representation is performed under a most deferential standard. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Our review begins with the presumption that there are numerous ways to provide effective assistance in any given case, and the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *People v. Perry*, 224 Ill. 2d 312, 344 (2007). Unlike a reviewing court, trial counsel observed the relevant proceedings, knew about information outside the record, and interacted with the client, with opposing counsel, and with the judge. *Harrington*, 562 U.S. at 105.

¶ 44      Even if hindsight reveals that counsel made a mistake or error in judgment, such an error standing alone will not render counsel's performance deficient under *Strickland*. *Perry*, 224 Ill. 2d at 355-56. Instead, a defendant must show that counsel's errors were so serious, and his

performance so deficient, that he did not function as the counsel guaranteed by the sixth amendment. *Id*. at 342.

¶ 45    As for his presentation of the witnesses' testimony at trial, defendant contends that trial counsel's errors left him "with essentially no character evidence supporting his defense." When trial counsel questioned Jeffrey Guilbo, counsel asked background questions to establish that Guilbo had known defendant for about 4 years and interacted with him every day at work. Counsel then asked whether Guilbo had ever heard anyone talk about defendant's reputation for truthfulness or peacefulness to which Guilbo replied "no." Counsel then asked whether Guilbo himself knew whether defendant had such a reputation and Guilbo responded, "yes, he does." The trial court then sustained an objection to Guilbo testifying about defendant's reputation for being truthful or peaceful because Guilbo had already stated he had never heard anyone discuss those matters.

¶ 46    However, since Guilbo had responded in the affirmative that defendant had a reputation for truthfulness or peacefulness, the trial court permitted him to clarify how he knew defendant's reputation for truthfulness and peacefulness if he had never heard anyone talk about it. Guilbo testified that he knew of defendant's good reputation based on his personal knowledge as he was in the process of preparing defendant to become a supervisor and had been training him and monitoring him during their daily interactions. Thus, trial counsel was able to elicit that Guilbo had personal knowledge of defendant's positive personal attributes due to their close working relationship. The clear inference from Guilbo's testimony was that he had a good opinion of defendant and believed him to be truthful and peaceful because he was in the process of helping him secure a promotion and personally observed defendant's conduct and demeanor each day. Although Guilbo did not straightforwardly provide reputation evidence about what he had heard

- 14 -

about defendant's character, he provided opinion evidence about what he knew about defendant's character.

¶ 47    When trial counsel questioned Edward Binion, counsel asked background questions to establish that Binion had known defendant for at least seven years and spent lots of time with him both at work and socially. Binion testified that he had never heard anyone talk badly about defendant. When asked if he had ever heard anyone talk about defendant being a peaceful or mild person, Binion responded affirmatively before stating under further questioning that he never heard any specific conversations about defendant's reputation. Like with Guilbo, the inference from Binion's testimony was that he had a good opinion about defendant's character, considered him to be truthful and peaceful, and had never heard anyone speak in a negative manner about those matters.

¶ 48    With both character witnesses, trial counsel elicited evidence that aligned more with the witnesses' opinions of defendant than his reputation. When a theory of self-defense is raised in a battery or homicide case, evidence of the peaceful or violent character of either party is relevant as circumstantial evidence to show whether the complainant or the accused was the initial aggressor (citing McCormick, Evidence § 199, at 566 (character of the accused) and § 193, at 572-73 (character of the victim) (3d ed. 1984)). *People v. Randle*, 147 Ill. App. 3d 621, 625 (1986). "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation, or by testimony in the form of an opinion." Ill. R. Evid. 405(a) (West 2022) (eff. January 1, 2011). Although defendant suggests counsel erred by only asking the witnesses about defendant's reputation and "did *not* ask the witnesses their personal opinion," the evidence in the record reflects both witnesses' positive opinion about defendant's truthfulness and peacefulness. A defendant is entitled to competent,

not perfect, representation. *People v. Stewart*, 122 Ill. App. 3d 546, 550 (1984). Here, trial counsel provided the trial court with evidence from two close associates that they believed defendant to be truthful and peaceful. The trial court heard the evidence even though it may not have been elicited in the most artful way.

¶ 49    Defendant suggests that the proposed character witnesses would have overcome the supposed shortcomings in the evidence about defendant's reputation and character. Kevin Ray, one of the witnesses defendant claims should have been called to testify, supplied an affidavit in support of defendant's postconviction petition. Ray's affidavit is brief and is largely conclusory. It contains four simple statements taking up less than half of one page. Ray avers in his affidavit that trial counsel contacted him prior to trial and he was willing to testify, but he was never sent a subpoena. Ray would testify to defendant's truthfulness and good character and that he has not known or heard of defendant "to lie, make false promises, or cheat anyone."

¶ 50    The attestation from Ray does not add anything significant to the testimony that was already introduced at trial. Ray provides the same evidence about defendant's character that was elicited at trial through Binion and Guilbo—that he has not known or heard of defendant being dishonest and, therefore, believed him to be a truthful person. Evidence is considered "cumulative" when it adds nothing to what was already before the factfinder. *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009). When evidence offered in support of a postconviction claim is merely cumulative, it cannot be said that the evidence is of such a character that it would be likely to change the result on retrial. *People v. Deloney*, 341 Ill. App. 3d 621, 632 (2003). The attestations offered by Ray, even when taken in the light most favorable to defendant, similarly fail to establish a reputation for truthfulness as they only evidence Ray's personal knowledge that defendant lacks a negative reputation.

¶ 51　Moreover, Ray's affidavit makes clear that counsel knew about him, contacted him before trial, but then did not send him a subpoena to testify. Instead, trial counsel decided to present testimony from two different character witnesses. We must presume that counsel decided as a matter of trial strategy that Ray's testimony was unhelpful or could be potentially damaging for some reason. Counsel may have concluded, as the affidavit currently shows, that Ray could offer nothing more than the other two character witnesses, and counsel opted not to present the cumulative testimony. A strong presumption exists that trial counsel acted effectively in investigating a case. *People v. Brown*, 2017 IL App (1st) 150203, ¶ 29. Unlike a reviewing court, trial counsel observed the relevant proceedings, knew about information outside the record, and interacted with the client, with opposing counsel, and with the judge. *Harrington*, 562 U.S. at 105. Defendant fails to overcome the presumption that counsel acted effectively and acted with professional discretion when deciding to call Binion and Guilbo, and not Ray.

¶ 52　Dameon Jones' affidavit is similarly brief. It contains four simple statements similar to those in Ray's affidavit. Jones avers that trial counsel never contacted him before trial, but that he would have been willing to testify as to defendant's character and reputation. Jones would testify that he knows defendant to be a peaceful person as he has "never witnessed any aggressive tendencies or seen him start any fights." Jones would further testify that he "has not known or heard of [defendant] to lie, make false promises, or cheat anyone." As with Ray's statements, Jones has merely offered his own, largely conclusory opinion about defendant's character and his personal knowledge that defendant lacks a negative reputation. Jones' attestations add nothing significant to the trial record consisting of the character witnesses who did testify.

¶ 53 Clarissa Carthans' affidavit is more detailed than the others but also suffers from deficiencies that render it insufficient to sustain defendant's burden. Carthans avers that she spoke to defendant's attorney before trial and told him everything that was included in her affidavit. She avers that even though she was "going through a divorce, eviction, health issues, etc.," she would have dropped everything for defendant and would testify on his behalf. Carthans speaks glowingly about defendant throughout her affidavit. She is defendant's first cousin and, according to her affidavit, was more like his sister. Trial counsel may have seen the strong bias Carthans' possessed and decided her testimony would not be significantly impactful in the bench trial. See *People v. Dean,* 226 Ill. App. 3d 465, 468 (1992) (finding that the decision not to call alibi witnesses was trial strategy because all three witnesses were relatives of the defendant and their testimony would thus be afforded little weight); see also *People v. Lacy,* 407 Ill. App. 3d 442, 466 (2011). Like with Ray's putative testimony, trial counsel was aware of Carthans and what she would testify about and decided to call two other character witnesses instead. See *Harrington*, 562 U.S. at 105.

¶ 54 Carthans' affidavit also focuses on attempting to attack the credibility of Atkins. Carthans recounted that Atkins was "a firecracker from what I heard," "big booty, bad attitude." Carthans avers that defendant was present with her on the day Atkins tires were slashed. Defendant received a call from Atkins upset about her tires and Carthans heard defendant telling Atkins he could not be in two places at once, as he was with his cousin in Bellwood. Much of Carthans' testimony would have been inadmissible hearsay. See Ill. Rs. Evid. 801, 802 (West 2022) (eff. Jan. 1, 2011). Moreover, defendant did not claim at trial, nor did he claim in his postconviction petition, that Atkins' reputation for truthfulness was an issue, and she was not the victim in this

case. Defendant similarly did not claim at trial or in his postconviction petition that Atkins was untruthful and he did not attempt to attack her character or impeach her testimony in any way.

¶ 55 To the extent that Carthans' affidavit does contain evidence about defendant's reputation and good character, defendant nonetheless fails to show that trial counsel acted in an objectively unreasonable manner when he decided to call two other witnesses to testify about defendant's character. Trial counsel could have determined that Carthans' biased testimony would have actually been harmful to defendant's case. The attacks on Atkins could have also proved harmful to defendant, especially where the trial court found her to be credible and a sympathetic witness. Even when the evidence is taken in the light most favorable to defendant, he has failed to overcome the presumption that counsel exercised professional discretion in choosing to have professional acquaintances Binion and Guilbo testify rather than Carthans. See *Brown*, 2017 IL App (1st) 150203, ¶ 29.

¶ 56 In addition to failing to demonstrate that trial counsel's representation fell below an objective standard of reasonableness, defendant has failed to demonstrate prejudice. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691 (citing *United States v. Morrison*, 449 U.S. 361, 364-65 (1981)). "Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's conduct, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694; *People v. Dupree*, 2018 IL 122307, ¶ 44. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 687; *see also People v. Graham*, 206 Ill. 2d 465, 476

(2003). *Strickland* requires that a defendant's claim be based on actual prejudice and not merely speculation of prejudice. *People v. Bew*, 228 Ill. 2d 122, 135 (2008).

¶ 57     Defendant's postconviction claim is that his trial counsel was ineffective for calling certain character witnesses and not others. Additionally, defendant claims that counsel failed to properly and adequately question the witnesses he did call in order to elicit testimony about defendant's reputation for peacefulness and truthfulness. The record shows that, even if counsel acted in the manner defendant now argues he should have acted, it would not have altered the outcome of the trial.

¶ 58     Even if trial counsel had been more successful in bolstering and establishing defendant's reputation, the evidence would not have been able to cover the internal inconsistencies in defendant's own testimony and the damage defendant did to his own credibility. Defendant admitted at trial that he lied multiple times to the police after he was arrested. Even if defendant previously had a reputation for truthfulness, he plainly admitted that he had already been dishonest in this very case. The trial court found that defendant "totally obliterate[d] his credibility" through his dishonesty and it is apparent that testimony from his close family and friends about his character in the past would have been unlikely to change that perception. None of the potential witnesses had any personal knowledge of the shooting that killed Maurice Matthews.

¶ 59     The evidence of defendant's guilt is such that the proffered evidence is insufficient to show that, if counsel acted in the manner defendant suggests, the outcome of the trial would have been any different. Both Atkins and Dawn Jones were eyewitnesses to the shooting. They both testified that Matthews was not acting in a threatening way and did not have anything in his hands when he approached defendant's vehicle. Both eyewitnesses testified that defendant was

the initial aggressor. Defendant admits taking out his gun and chambering a live round, despite that he claims he had only taken out the gun to scare Matthews and never intended on using the weapon.

¶ 60    Defendant's testimony for how he ended up at Atkins' house was even proved to be dishonest. Defendant claimed that he went to Atkins' house after she texted him at 11 p.m. to say she was home so that he could come over. However, the phone records showed that defendant called Atkins 13 times and sent her 5 text messages between 8:50 p.m. and 11:59 p.m while Atkins only texted defendant twice that night, at 9:32 p.m. and 9:34 p.m. Defendant also told police he was not at Atkins' house that night and had never been there before. However, in his own testimony, he testified that he was at Atkins' home a few days before the shooting where they hugged and kissed, and he further testified he was there again at the time of the shooting. Defendant's flight from the scene of the shooting and his lying to the police about being present there are both inconsistent with self-defense and constitute strong evidence of his consciousness of guilt. See *People v. Walker*, 2020 IL App (4th) 180774, ¶ 93 (lying to the police may be considered evidence of consciousness of guilt); *People v. Harris*, 52 Ill. 2d 558, 561 (1972) (evidence of flight is admissible to show consciousness of guilt); *People v. Wrancher*, 2022 IL App (2d) 210134-U, ¶ 100 (failure to call police showed consciousness of guilt).

¶ 61    The court stated that it found Atkins to be credible and noted that her testimony was corroborated by her mother and Dawn Jones as well as by the physical evidence. The evidence offered by defendant in his postconviction petition, had it been introduced at trial, would not have done anything to cause the trial court to decide the credibility issues differently. The trial court found that defendant's testimony was "truly incredible," "ludicrous," and "border[ed] on the absurd." Even if it was assumed defendant had a pristine reputation for honesty prior to trial,

there is no reason to believe the trial court would have found ludicrous testimony to be credible. In short, as the State points out, "no amount of character testimony could have rehabilitated defendant's own testimony about the shooting, [so] defendant fails to set forth a substantial showing that he suffered the actual prejudice required by *Strickland*." Because defendant has failed to make the requisite showing of prejudice for an ineffective assistance of counsel claim, the trial court did not err when it dismissed his postconviction petition. See *Strickland*, 466 U.S. at 694 (to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's conduct, the result of the proceedings would have been different).

¶ 62　*Ineffective Assistance from Postconviction Counsel*

¶ 63　Defendant also asserts on appeal that his privately retained postconviction counsel provided him with ineffective assistance. Under the Post-Conviction Hearing Act, a petitioner is entitled to a "reasonable level of assistance" from counsel. *People v. Perkins*, 229 Ill. 2d 34, 42 (2007). The reasonable level of assistance that must be provided to petitioners under the Act is less than that afforded by the federal and state constitutions. *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006). Whether postconviction counsel has provided a defendant with reasonable assistance is reviewed *de novo. Perkins*, 229 Ill. 2d at 41; *People v. Turner*, 2023 IL App (1st) 191503, ¶ 22.

¶ 64　Defendant argues that the trial court noted many deficiencies with defendant's postconviction claims which demonstrated how postconviction counsel failed to fashion and present defendant's claims in an adequate manner. Defendant contends that postconviction counsel should have attached an evidentiary affidavit from him. Defendant suggests that he could have provided an evidentiary affidavit to demonstrate that he provided a list of character witnesses to trial counsel before trial.

¶ 65    However, postconviction counsel argued in the petition that defendant's trial counsel failed to call at least three witnesses at trial, and counsel produced three affidavits from these prospective trial witnesses. It is unclear what an evidentiary affidavit from defendant would have added to his claim as the affiants were identified and their affidavits supported the contentions raised in the petition. Trial counsel selected two of the character witnesses from the potential witnesses provided by defendant and opted not to go forward with the others. The affidavits supplied by postconviction counsel facially supported the petition's contention that trial counsel had failed to call witnesses who could have provided material testimony to support defendant's theory of defense at trial. In addition, defendant had already testified in his own defense and provided ample evidence in support of his theory of self-defense. He does not identify what more he could have provided in an affidavit that could have potentially led to the success of his postconviction claim.

¶ 66    Postconviction counsel was able to defeat the procedural argument raised by the State that the petition was untimely by invoking the Covid-19 pandemic and the administrative difficulties it caused for defendant.

¶ 67    With regard to the content of the character witnesses' affidavits, defendant argues that counsel should have pled the existence of prejudice and that counsel could have provided more detail in the pleading. However, defendant does not point to anything in the record, or even outside the record, that suggests the witnesses could have provided any further evidence or aided him in establishing prejudice.

¶ 68    The trial court recognized that defendant attempted to demonstrate prejudice, but the court ultimately concluded that no such prejudice could be established because the additional character witnesses offered evidence that was essentially cumulative of the character evidence

offered at trial. The trial court concluded that there was no indication that different questioning or the calling of different character witnesses would have changed the result at trial. Defendant likewise failed to overcome the presumption that counsel employed trial strategy in selecting the witnesses, but there is no indication defendant could have surmounted this obstacle even if trial counsel acted in the manner defendant suggests he should have acted. As the State points out, "[c]ontrary to defendant's claims, post-conviction counsel clearly raised prejudice under *Strickland*, but as the circuit court recognized, the evidence simply was not enough to establish that defendant suffered prejudice."

¶ 69     Defendant also argues that the manner of postconviction counsel adding new claims by supplementing the petition instead of amending it was a deficient and unreasonable presentation of his claims. However, defendant's claims were not dismissed because of the manner in which they were presented. The State did not press any objection about the supplements and addressed the matters on the merits. Similarly, the trial court addressed the merits of the added claims and did not dismiss them on a procedural basis but on a substantive one.

¶ 70     Finally, defendant argues that postconviction counsel failed to adequately support the additional claims raised in supplementary filings. In supplements to his petition, defendant asserted claims that trial counsel failed to adequately cross-examine Atkins' mother and the medical examiner and that counsel failed to adequately examine the two character witnesses who did testify at trial. Defendant contends that postconviction counsel failed to provide reasonable assistance by virtue of failing to provide any affidavits from Guilbo or Binion to detail what they would have testified about if properly examined. Defendant also contends that postconviction counsel failed to provide reasonable assistance with regard to the supplemental claims regarding

Atkins' mother and the medical examiner by failing to describe what they might have said in their testimony if they were properly examined.

¶ 71 The Supreme Court recently held that postconviction counsel's performance cannot be deemed unreasonable "simply because his arguments were without merit or because he was unable to make the petition's allegations factually sufficient to require the granting of relief." *People v. Williams*, 2025 IL 129178, ¶ 46. This is essentially what defendant asks us to find here. Where, as here, the postconviction petition properly states the gist of a constitutional claim but fails on the merits, counsel has generally not provided unreasonable assistance. *Id*. We are not required to assume that the facts outside the record would have been favorable to defendant had postconviction counsel simply found them. *Id*. at ¶ 47. Defendant has failed to show that the trial court erred when it dismissed his postconviction petition at the second stage and he has failed to show that he received unreasonable assistance from his postconviction counsel.

¶ 72                                          CONCLUSION

¶ 73 Accordingly, we affirm.

¶ 74 Affirmed.